# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 14, 2012

## STATE OF TENNESSEE v. BALEKE KROMAH

**Appeal from the Circuit Court for Rutherford County**
**No. F-64329    Don R. Ash, Judge**

---

**No. M2011-01813-CCA-R3-CD Filed - March 01, 2013**

---

The Defendant-Appellant, Baleke Kromah, was indicted by the Rutherford County Grand Jury for five counts of sexual battery by an authority figure. He was subsequently convicted by a Rutherford County Circuit Court jury of count three and was acquitted of the remaining counts. Kromah was sentenced to ninety days of imprisonment followed by four years of probation. On appeal, Kromah argues: (1) the evidence was insufficient to support his conviction, and (2) the trial court erred in failing to order the State to make an election of offenses at the close of the State's proof. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Guy R. Dotson, Jr., Murfreesboro, Tennessee, for the Defendant-Appellant, Baleke Kromah.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Laural A. Hemenway, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Facts.** Kromah and his wife adopted his niece, M.T.[1], who was born in Liberia. Following Kromah's divorce from his wife in 2008, fifteen-year-old M.T. began living with Kromah in Rutherford County. M.T. testified that in 2008 after the divorce Kromah committed five instances of sexual abuse against her. The first incident occurred when Kromah returned home at 3:00 a.m. or 3:30 a.m. after driving his taxi. He gave her a hug and

---

[1]It is this court's policy to refer to minors by their initials only.

touched her breast, and M.T. told him to stop touching her, but he would not stop. She said she cried and then fell asleep. The second incident occurred two or three days later when he touched her breast again. M.T. again told him to stop, but he did not stop. Then M.T. started crying, and Kromah left her room and went downstairs to his room. M.T. continued to cry until she fell asleep. The third incident occurred when Kromah came into her room between 3:30 a.m. and 4:00 a.m. when he got off from work and woke her up. He hugged her and placed his hand under her night shirt and began rubbing her breast and then moved his hand towards her vagina. M.T. started crying and told Kromah that she would scream if he did not stop. Kromah stopped touching her, walked out of her room, and went to his room. She said the third incident was the night before they went to the Lebanon flea market to sell items. On the way to the market, M.T. asked Kromah why he was touching her, and he responded, "Oh, I'm not grabbing your titty." She said he then shouted, "I'm just showing you what boys are gonna do to you. Remember when we used to live at your momma's house some boy call you and I heard that conversation about sex and stuff like that." M.T. responded, "Well, still, even though you're trying to tell me what boys are going to do to me you still don't have no right to grab my chest like my titty." She said Kromah continued to scream at her, and M.T. ended the conversation. She said the fourth incident occurred a week or two weeks after the third incident, at approximately 11:00 p.m. when Kromah came home to eat before going back to work, and he touched her breast. She said the fifth incident occurred just before Kromah left for work. M.T. was wearing a bra and tank top, and Kromah touched her breast on top of her clothes. M.T. told him to stop and was about to cry when Kromah left. M.T. said that her boyfriend was at the house when the fifth incident with Kromah occurred. She said that she was afraid that her boyfriend might see what Kromah was doing to her. Her boyfriend later asked her if she was okay, and she said she was fine and tried to change the subject because she did not want him to know what was happening. A week later, Kromah's two children from his previous marriage moved in with them. She said that after Kromah's children began living with them, the incidents stopped. She said she did not tell her adoptive mother sooner about the abuse because she knew Kromah would end up in jail and because she was encouraging Kromah to seek counseling on his own. She said she was also trying to move out of his home so that the abuse would end. Shortly after the fifth incident, M.T. moved in with her adoptive mother and informed her of the sexual abuse. Her mother then contacted the authorities. She also told her boyfriend that Kromah had sexually abused her after she moved in with her mother.

M.T. said that she recorded her conversation with Kromah six or seven months after the fifth incident of abuse. She said she wanted to record the conversation with Kromah because otherwise "he was going to deny it later on." M.T. said her mother was downstairs when she recorded her conversation with Kromah. She later translated the recording into English because the police could not find anyone else to translate it. She said that the recording depicted their conversation in its entirety. The recording of the telephone

conversation between M.T. and Kromah was played for the jury. Then M.T. read her translation of the conversation to the jury, which stated in pertinent part:

> [I said,] "I don't want to come over there this weekend." My dad said, "Why?" I said, "Because of what happened between me and you in the past. When I think about it I don't want to be around you." My dad says, "Say it in Mandingo." He said, "What did we do?" I said, "You don't remember?" I said, "When you used to come at night and touch me when we used to live behind the bowling center. That made me dislike you." My dad said, "How did I touch you?" I said, "When you touched my breast and played with them and then you tell me that this is what boys are going to do to me. And that is why you touched my breasts. Ever since you did that I didn't like you. That is why I don't call you." . . . And my dad said, "[M.T.], if you tell anybody that I grabbed your breast and played with you let the Lord have mercy. I told you to be careful. Don't allow guys to do anything to you. You forget about one thing. If I didn't like you you wouldn't be here and you would be married to someone." And I said, "I know all that." And then my dad said, "Let me talk. We're family. One mom. One dad. How am I going to do that to you?" I said, "Even if that's all, you are not supposed to do that to me. You are not supposed to touch my breasts. When you did it last year I wasn't stupid. I know what you were doing." And then I said, "Even if all that, you are not supposed to touch my breasts." My dad said, "Look. I was asleep. What you are saying, you're not the only one I played with. I play with all my kids. I don't want to talk too much. I will sleep. If I did something to you and you didn't like, I'm not forcing you to come over. The law force you to come over. And since you say I did something to you and you didn't like it, you should call me and tell me I did it." I said, "That's why I was calling you right now, to let you know because mom asked me if I was going to your house today and I said no. And I told her I wanted to call you and talk to you one on one. When I think about it I want to know why you did it." And then my dad said, "Listen, if you tell anybody this –" Then I say, "I know. I know. That's why I didn't tell nobody and it still hurts me when I think about it." . . . [I said,] "But you used to come at nighttime when you get off from work and touch my breast. And I would tell you to stop, stop.["] . . . I said, "I think about it every day." My dad said, "You think about it every day?" I said, "Yes. It hurts me." My dad said, "Hold on. Hold on. What I'm telling you is are you listening?" I said, "Uh-huh." "What I'm telling you is be quiet. Be quiet. Think about God. If I did something bad to you and it hurts you, please forgive me."

Shortly after making the recording, she was forced to visit Kromah, and she and Kromah got into an argument which resulted in the police being called. She and Kromah also got into a second argument when Kromah tried to force her to tell his daughter and son that she had lied about the sexual abuse, and she refused. During this argument, Kromah called her a prostitute, and M.T. called him a pervert. M.T. called Ladonna Davis, her adoptive mother, who could hear Kromah screaming at her and contacted the police. M.T. said the police talked to her before taking her back to her adoptive mother's house. M.T. said she told her adoptive mother about the abuse so that Kromah would not abuse the daughter that Davis had with Kromah.

On cross-examination, M.T. admitted that although she testified that she wanted to live with her adoptive mother at her adoptive parent's divorce hearing, she did not inform the court of Kromah's sexual abuse of her. She said she did not tell the court about the sexual abuse because she did not want Kromah to be sent to jail. Following the hearing, she moved in with her adoptive mother but had visitation with Kromah every other weekend. She stated that Kromah never tried to abuse her during these visitations; however, she said she always kept her brother and sister close to her. She stated that she finally told her adoptive mother about the Kromah's sexual abuse of her more than a year after it occurred because the police were forcing her to go to the visitations with her father pursuant to her adoptive parents' divorce decree.

Angela Istvanditsch, a detective with the Smyrna Police Department, testified that on December 16, 2009, she received a referral from the Department of Children's Services regarding the alleged sexual abuse of M.T. that took place in Rutherford County. She subsequently interviewed M.T. at the home belonging to her adoptive mother and her new husband. Following the interview, Detective Istvanditsch gave M.T. equipment to record a telephone conversation with Kromah and obtained permission from Davis for M.T. to record a telephone call between M.T. and Kromah. On December 24, 2009, M.T. telephoned Kromah and recorded the conversation. M.T. gave the recording to Detective Istvanditsch, who conducted an interview with M.T. and signed the warrants for Kromah's arrest. During the majority of the recording, Kromah and M.T. spoke Mandingo[2] with small bits of English scattered throughout their conversation. Detective Istvanditsch had M.T. prepare an English translation of the recording. She acknowledged that the recorder could have been stopped and started during M.T.'s conversation with Kromah, although she believed that the recording sounded as if it were an continuous conversation.

---

[2]The State's brief explains that "[t]he Mandinka language, also known as Mandingo, is a tonal language spoken by roughly 1.35 million Mandinka people in Mali, Senegal, Gambia Guinea, Côte d'Ivoire, Burkina Faso, Sierra Leone, Liberia, Guinea-Bissau, and Chad."

Kafumba Kromah, who was a native speaker of the Mandingo language, provided a translation of the recorded conversation between M.T. and the Defendant-Appellant that was substantially the same as the one provided by M.T. He stated that he was not related to and had never met the Defendant-Appellant and had never met the M.T. He also confirmed that the Defendant-Appellant apologized to M.T. during the conversation.

Ladonna Davis, M.T.'s adoptive mother, testified that she observed a change in the way that M.T. acted towards Kromah following their divorce. Davis said that M.T. "was broken in a way" and did not want to live with him anymore. When M.T. in December 2009 informed her of Kromah's abuse, Davis said she immediately contacted the Department of Children's Services to report the abuse.

The Defendant-Appellant, Baleke Kromah, testified he adopted M.T. in Africa after M.T.'s grandmother, who was also Kromah's mother, passed away. Kromah denied that he committed the offenses in this case. He acknowledged that he apologized to M.T. during the recorded telephone conversation but asserted that his apology was for the way he treated her during a gymnastics competition in Chattanooga and was not an admission that he abused her. Kromah said that he first learned about M.T.'s allegations against him on December 29, 2009. He claimed that M.T. made these allegations against him because she did not want to follow his rules, especially after she began dating someone.

On cross-examination, Kromah admitted that M.T. had called and confronted him about the alleged incidents of sexual abuse prior to December 29, 2009. He conceded that Kafumba Kromah's translation of the recorded conversation between him and M.T. was mostly accurate.

Renita Crittendon, the Defendant-Appellant's girlfriend, testified that she and Kromah had been dating since April 2009. She said she had met M.T. twice and never observed any problems between the M.T. and Kromah.

Lee Tarpeh, Baleke Kromah's neighbor, testified that he often kept M.T. after school and that he believed M.T. and Kromah had a good relationship. He said he noticed no change in M.T.'s attitude toward Kromah over the course of 2008.

Bambie Mansaray, who met Kromah and M.T. in 2007 through the African Muslim Association, testified that she saw them once a month until she got to know Kromah better and began seeing them more often. She also stated that she noticed no change in M.T.'s attitude toward Kromah from 2007 to 2008.

## ANALYSIS

**I. Sufficiency of the Evidence.** Kromah argues that the evidence was insufficient to sustain his conviction because it failed to show that the act of touching M.T.'s breasts, if it in fact occurred, was done for the purpose of sexual arousal or gratification. He asserts that even if the victim's testimony is taken as true, the proof shows that he "touched her as a form of discipline to show what boys would do to her if she continued her course of dating older boys." The State responds that the evidence was sufficient to support Kromah's conviction for sexual battery by an authority figure. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Tennessee Code Annotated section 39-13-527 defines sexual battery by an authority figure as the following:

> [U]nlawful sexual contact with a victim by the defendant or the defendant by
> a victim accompanied by the following circumstances:

(1) The victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age; or

(2) The victim was, at the time of the offense, mentally defective, mentally incapacitated or physically helpless, regardless of age; and,

(3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact; or

(B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact.

Tennessee Code Annotated section 39-13-501(6) defines sexual contact as the following:

"Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

"Intimate parts" include "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" T.C.A. § 39-13-501(2). This court has routinely held that, in cases of this type, "intent is almost always proven circumstantially." State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973)) (concluding that the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant's touching of the victim was for the purposes of sexual arousal or gratification when the proof showed that the defendant, while wearing only his underwear, touched the victim's breast and clothing over her breast at times while the victim's mother was away from the house and kissed the victim while attempting to stick his tongue in her mouth); see State v. Robert Charles Taylor, No. M2010-00033-CCA-R3-CD, 2010 WL 3582498 , at *6 (Tenn. Crim. App. Sept. 15, 2010), perm. app. denied (Tenn. Feb. 17, 2011); State v. Jeffrey Mark Klocko, No. M2006-01359-CCA-R3-CD, 2008 WL 2743692, at *10 (Tenn. Crim. App. June 16, 2008), perm. app. denied (Tenn. Dec. 22, 2008). Moreover, this court has held that "jurors may use their common knowledge and experience in making reasonable inferences from evidence." State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) (citing 23A C.J.S. Criminal Law § 1380).

Viewing the evidence in a light most favorable to the State, the proof established that the victim was fifteen years old at the time the offenses occurred and that she lived with Kromah, her uncle and adoptive father, who had parental or custodial authority over her and used the authority to accomplish the sexual contact. The victim testified that Kromah entered her bedroom between 3:30 a.m. and 4:00 a.m. when he got off from work and woke her up. He hugged her and placed his hand under her night shirt and began rubbing her breast and then moved his hand towards her vagina. The victim began crying and told Kromah that she was going to scream if he did not stop. Kromah stopped touching her, walked out of her room, and went to his room. Although the victim stated that Kromah told her that he touched her breast to show her "what boys are going to do," the jury's verdict showed that it rejected this explanation of Kromah's behavior. As previously noted, this court will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Accordingly, we conclude that there was sufficient evidence to convict Kromah of sexual battery by an authority figure.

**II. Election of Offenses.** Kromah argues that the trial court erred in failing to require the State to make an election of offenses. Specifically, he contends that the State failed to make an election as to the offense on which they were relying in each count and failed to make an election on whether it was relying on the act of touching the breast or touching the vagina in count three. The State responds that Kromah has waived this issue by failing to include the State's closing argument in the record on appeal. The State also contends that the transcript from the motion for new trial hearing shows that the State did, in fact, make an election during its closing argument.

The Tennessee Supreme Court stressed the importance of election in State v. Adams:

> "This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) (citing Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801 (Tenn. 1973)). This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. Brown, 992 S.W.2d at 391; Burlison, 501 S.W.2d at 803. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately

touching on the constitutional rights of an accused . . . . " Burlison, 501 S.W.2d at 804.

24 S.W.3d 289, 294 (Tenn. 2000).

We agree with the State that Kromah waived this issue by failing to include a transcript of the State's closing argument in the record on appeal. This court has routinely held that "a prosecutor's closing argument may effectively serve as an election of offenses." State v. Anthony Allen, No. W2004-01085-CCA-R3-CD, 2005 WL 1606350, at *14 (Tenn. Crim. App. July 8, 2005) (citing State v. William Dearry, No. 03C01-9612-CC- 00462, 1998 WL 47946, at *13 (Tenn. Crim. App., at Knoxville, Feb. 6, 1998), perm. app. denied (Tenn. Jan. 19, 1999)), perm app. denied (Tenn. Dec. 19, 2005). The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

Moreover, the existing appellate record, including the order denying the motion for new trial, shows that the State made an election of offenses during its closing argument. At the motion for new trial hearing, which was also included in the record, the assistant district attorney asserted that she read a document containing an election of offenses to the jury and gave the jury a presentation in which she set out the particular facts for each count. In addition, at this hearing, the assistant district attorney admitted a document, entitled Election of Offenses, which included the relevant facts for each count of the indictment. After reviewing this document, we conclude that it provided a proper election of offenses in this case. Consequently, notwithstanding Kromah's waiver of this issue, we agree with the State that the existing appellate record indicates that the State made a proper election of offenses in this case. Regarding Kromah's contention that the State failed to make an election as to whether it was relying on the act of touching the breast or touching the vagina in count three, we conclude that the both the election of offenses document and the facts at trial showed that Kromah touched the breast, began moving his hand towards the victim's vagina, and stopped when the victim threatened to scream. Kromah is not entitled to relief on this issue.

**Conclusion**. The judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE